THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| Aubray Pugh, Olivia Lees, and Cassidy Elliott <br><br>      Plaintiffs, <br><br> v. <br><br> Lady Jane's Haircuts for Men Holding Company, LLC; Lady Jane's Murfreesboro TN, LLC; Lady Jane's Nashville – Cool Springs TN, LLC, Michigan <br><br>      Defendants. | Case No.: <br><br> Honorable Judge <br> Magistrate Judge |

## COMPLAINT PURSUANT TO THE FAIR LABOR STANDARDS ACT OF 1938

Plaintiffs Aubray Pugh, Olivia Lees, Cassidy Elliott ("Plaintiffs") file this lawsuit against (1) Defendant Lady Jane's Haircuts for Men Holding Company, LLC; (2) Defendant Lady Jane's Murfreesboro TN, LLC; (3) Lady Jane's Nashville – Cool Springs TN, LLC, Michigan ("Defendants" or "Lady Janes") for violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §201, *et seq.*

For Defendants violation of the FLSA's minimum wage, overtime compensation, and tip rights, Plaintiffs seek the recovery of unpaid wages, overtime compensation, misappropriated tips, unlawful kickbacks/deductions plus an equal amount as liquidated damages, as well as an award of reasonable attorney's fees, costs, and expenses of litigation.

For Defendants violation of the FLSA's anti-retaliation provisions, Plaintiffs seek all legal or equitable relief as may be appropriate to effectuate the purposes of 29 U.S.C. §215(a)(3), including, without limitation, lost wages, back pay, out-of-pocket expenses, and an additional

amount as liquidated damages, as well as compensation for emotional distress and punitive damages, an award of reasonable attorney's fees, costs and expenses of litigation.

Plaintiffs seek an award of pre- and post- judgment interest, and lump sum for increased tax liability related to any award payment.

<u>PRELIMINARY STATEMENT</u>

Lady Janes engages hairstylists to perform hairstyling services for men in over 90 salons under the "Lady Janes Haircuts for Men" banner in 20 states and 20 major cities. Lady Janes charges hairstylists for the right to work at a Lady Janes' salon and makes money from hairstylists in the form: (1) service charges; (2) product sales; (3) booth rentals; and (4) other miscellaneous fees. Lady Janes does not pay hairstylists any direct wages.

Lady Janes denies having an employer-employee relationship with hairstylists. Lady Janes employs "independent contractor agreements" to mislead hairstylists about the working conditions at its locations and to justify not paying hairstylists any wages. Once a hairstylist begins at a Lady Janes location the realities of the working relationship between Lady Janes and hairstylists is that of an employer-employee relationship.

Plaintiff Aubray Pugh worked as a hairstylist throughout her working relationship with Defendants. Eventually, Defendants dubbed Plaintiff as the Murfreesboro "Salon Manager." At no time did Defendants pay Plaintiff a direct wage. Plaintiff, like other hairstylists, opposed to Defendants constant monitoring, supervision, demands and control over their job performance without compensation. Plaintiff was replaced and terminated because of her opposition and support of hairstylists opposition to being labelled as independent contractors, while being treated as employees. Defendants terminated Plaintiff to discourage her and other hairstylists from exercising their rights under Fair Labor Standards Act of 1938.

2

Plaintiff Olivia Lees worked as a hairstylist throughout her working relationship with Defendants. Defendants promoted Plaintiff to Key Holder at the Murfreesboro Salon. At no time did Defendants pay Plaintiff a direct wage. Plaintiff, like other hairstylists, opposed Defendants' constant monitoring, supervision, demands and control over their job performance without compensation.

Plaintiff Cassidy Elliott worked as a hairstylist throughout her working relationship with Defendants. Plaintiff Elliott split time between Cool Springs and Murfreesboro locations. She was the manager of the Lady Janes Cool Springs from June of 2019 through January of 2020. She was a hairstylist at the Murfreesboro location from January 2020 through February 2022. At no time did Defendants pay Plaintiff a direct wage. Plaintiff, like other hairstylists, opposed to Defendants constant monitoring, supervision, demands and control over their job performance without compensation.

I.   JURISDICTION

1.   This court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 29 U.S.C. § 216(b).

2.   Venue is proper under 28 U.S.C. § 1391.

III.  PARTIES

3.   Defendant Lady Jane's Haircuts for Men Holding Company, LLC ("Lady Jane's Holding Co.") is a Michigan company doing business as "Lady Jane's Haircuts for Men" throughout the United States.

4.   Lady Jane's Holding Co. is not registered with the Tennessee Secretary of State.

5.   Lady Jane's Holding Co. operates 4 locations in Tennessee and does business as:

    a.        Lady Jane's Murfreesboro TN, LLC [**Exhibit 1**];

    b.        Lady Jane's Nashville - Cool Springs TN, LLC [**Exhibit 2**]; and

    c.        Lady Jane's Cleveland TN, LLC.

    d.        Lady Jane's Hermitage TN, LLC

6.      Defendants are all entities formed in Michigan.

7.      Defendants operate under the common brand banner of Lady Jane's Haircuts for Men.

8.      The owner of Lady Jane's Haircuts for Men is Chad Johnson and he is identified as the registered agent on Defendants filings with the Michigan Secretary of State. [**Exhibit 3**]

9.      Tim McCollum ("McCollum") is the president of Lady Janes.

10.    McCollum is an employer acting directly and indirectly in the interest of Lady Jane.

11.    Victoria Franz ("Franz") is the Director of Operations and part of Lady Jane's Corporate Operations team.

12.    Franz is an employer acting directly and indirectly in the interest of Lady Jane.

13.    Plaintiff Pugh is a citizen and resident of Tennessee, residing in Rutherford County.

14.    Plaintiff Lees is a citizen and resident of Tennessee, residing in Rutherford County.

15.    Plaintiff Elliott is a citizen and resident of Tennessee, residing in Rutherford County.

16.    Plaintiffs submit their written consent pursuant to 29 U.S.C. § 216(b). [**Exhibit 4**].

**IV.**    **FACTUAL ALLEGATIONS**

**A.**    **LADY JANE'S ORGANIZATIONAL STRUCTURE**

17.    Chad Johnson ("Johnson") is the owner of Defendant Lady Jane's Haircuts for Men Holding Co. LLC ("Lady Jane's Holding Co.").

18.    Lady Jane's Holding Co. corporate headquarters is located at 34915 Woodward Ave, Birmingham, Michigan, 48009.

19.     The Lady Jane's Holding Co. owns and controls the privately held nationwide chain of men's hair salons.

20.     Johnson through the Lady Jane's Holding Co. owns and operates the "Lady Jane's Haircuts for Men" brand.

21.     According to Lady Jane's website they operate approximately 90 locations in 20 states and 20 major cities.

22.     Tim McCollum is Lady Jane's President.

23.     Jesse Dhillon is Lady Jane's Vice President.

24.     Alicia Bunch is Lady Jane's Chief Operating Officer.

25.     Sean Hughes is Lady Jane's Director of Finance.

26.     Kathy Banks is Lady Jane's Controller.

27.     Mike Ziats is Lady Jane's Accounting Manager.

28.     Zach Schewee is Lady Jane's Operations Analyst.

29.     Victoria Franz is Lady Jane's Director of Operations

30.     Defendants utilizes a central management team to monitor and control the operations of each location.

31.     Defendants would contact Pugh on days Pugh was not working to address staffing issues.

32.     Defendants utilize a central management team to monitor and control the finances of each location.

33.     Defendants monitor services charged and whether the tips are "high" compared to others performing the same services, and ask local Salon Managers if they have observed anything odd.

34. Defendants will call hairstylists clients to determine what services were performed and instruct Salon Managers to void out transactions an re-run them "correctly."

35. Defendants utilize a central management team to monitor and control the systems of each location.

36. Defendants ensure each location follows common policies, procedures and practices through Directors of Operations.

37. Operations Managers are responsible for working with a team of other "corporate employees, to oversee the operations of nationwide salons, according to Lady Jane's systems and procedures."

38. Operations Managers supervise Regional Managers and Salon Managers.

39. Defendants manage locations through Salon Managers who supervise the stylists and the sale of services and products.

**B.     LADY JANE'S OPERATIONS AND SYSTEM**

40. Defendants operates each location pursuant to company-wide policies, procedures and practices.

41. Defendants utilize a customized point-of-sale (POS) software.

42. Lady Janes directs hairstylists to report changes in their schedules into "Live Time."

43. Lady Janes requires new hairstylists submit a copy of their driver's license, cosmetology or barber license, and e-mail address, and photo before creating a profile.

44. Defendants monitor each location's scheduling of hairstylists.

45. Defendants requires hairstylists to sign an Independent Contractor Agreement and to initial a document entitled "What your LJ Contract Means."

46.     Defendants' Agreement states the relationship between Defendant and hairstylists is one in which hair stylists are "contractors."

47.     Defendants' Agreement states that hairstylists are responsible for agreeing to scheduled working hours; making appointments; "conducting and controlling services;" providing their own tools, equipment, and supplies; keeping the "contracted workspace in a clean and sanitary manner;" reporting all taxes resulting from services performed; and maintaining a valid professional license.

48.     The price charged to clients for each service is based on Lady Jane's menu of services and a minimum price per service.

49.     Shop Charges, applicable promotional other discounts deducted from the total service price performed to establish a final service charge.

50.     Hairstylists receive money based on a percentage of the final service charge clients pay.

**C.     LADY JANE'S SERVICES AND GOODS**

51.     Lady Jane's offers a variety of services, including haircuts, shaves, styling, and coloring.

52.     Lady Jane's website informs customers that they can expect the same menu of services during a visit to any Grooming Salon across the United States and offers the same discount and satisfaction guarantee customers nationwide.

53.     Lady Jane's customers nationwide may opt for services chosen from a menu of à la carte services.

54.     Lady Jane's locations offer men grooming products.

55.     Lady Jane's employs hairstylists to provide services including:

        a.      Precision Haircuts;

        b.      Invigorating Shampoos;

  c.  Hair and Scalp treatment;

  d.  Colors and highlights;

  e.  Facial hair trim;

  f.  Hot lather neck shave;

56. Lady Jane's employs hairstylists to sell the men grooming products.

**D. LADY JANE'S HAIRSTYLISTS**

57. Lady Jane's website advertises :



58. Defendants present hairstylists with written agreements before they are allowed to work at any of their locations.

59. Defendants label hairstylists as independent contractors.

60. Defendants require each hairstylist to pay a daily minimum dollar amount as "rent."

61. Defendants require each hairstylist to pay a percentage of their service sales as "rent."

62. Defendants require each hairstylist to pay a percentage of their product sales as "rent."

63. Defendants require every hairstylist to pay a nominal amount every day into a "product fund."

64. Defendants do not pay hairstylists any amount as a direct wage.

65. Defendants did not issue hairstylists W-2s.

66. Defendants issue hairstylists 1099s.

67. Defendants willfully decided not to pay hairstylists any direct wages.

68. Defendants have not and are not claiming the hairstylists are subject to 7(i) retail exemption.

69. Defendants have not and are not claiming hairstylists fall within the executive exemption under the FLSA.

70. Defendants have not and are not claiming hairstylists fall within the administrative exemption.

71. Defendants have not and are not claiming hairstylists are classified as "tipped employees" under the Act.

72. Defendants have not paid hairstylists any amount as a commission.

73. Defendants have not claimed a tip credit for hairstylists.

**E.      LADY JANE'S TENNESSEE LOCATIONS**

74. Lady Janes Holding Co. has 4 locations in the state of Tennessee.

75. Johnson is listed as the registered agent for all Tennessee locations entities.

76. Defendants have written policies and procedures directed to hairstylists.

77. The hours of operation include:

    a.      Monday through Thursday 10am – 8pm.

    b.      Friday 9am – 8pm;

    c.      Saturday 9am – 6pm; and

    d.      Sunday 10am – 5pm.

78. Defendants provide an explanation to the hairstylist "contract" including:

    a.      Agreeing to and responsible for scheduled working hours

b.      Hairstylist responsible for bringing own personal cutting tools, equipment and supplies;

c.      Lady Janes provides barber chair, station with mirror, shelf, storage tool box for supplies, barbicide, shampoo and conditioner, waxing supplies and facial supplies;

d.      Lady Janes provides all advertising in local market.

e.      Hairstylist agrees to the price of all services in there salon;

f.      Hairstylist agrees to pay

     i.      60% of services performed;

     ii.      86% on product sales;

     iii.      3% on all credit card sales

g.      Termination at will.

79.      Defendants have a hairstylist "Performance Agreement"

a.      Agree to arrive to work 15 minutes before scheduled start time;

b.      Follow salon policies on call outs and shift coverage;

c.      Daily/nightly cleaning obligations;

d.      Failure to maintain consistent adherence may result in the contract to be reviewed and further action will be discussed;

e.      Refusal to sign the agreement will result in days being cut.

80.      Defendants have policies stating:

a.      Arrival to work late will result in a documented verbal warning

b.      Second occurrence will result in being sent home or loss of a day on schedule

c.      Leaving early requires the hairstylist has rest of shift covered

     i.      If not covered then documented verbal warning

ii. Second occurrence will result in being sent home or loss of a day on schedule

iii. Third occurrence will result in <u>permanent</u> loss of day on schedule.

81. Defendants have hairstylist daily expectations including"

    a. Activating and deactivating themselves;

    b. Knowing agreed upon schedule;

    c. Ensuring contracted shift covered if needed'

    d. Bringing change for clients transactions.

82. Defendants have customer service expectations including:

    a. Each client be checked into Lady Janes system;

    b. Minimum of 3 stylist to be on cutting floor;

    c. Offering customer additional services;

    d. Provide customer with a business card with name on it;

83. Defendants require hairstylists submit requests for days off.

84. Defendants tell hairstylists the salon must stay staffed to ensure we are taking care of our clients in a timely manner to keep them coming back.

85. Defendants provide that hairstylists may qualify to leave early on slow days if they achieve highest average/amount in the following categories:

    a. color service;

    b. highest ticket;

    c. highest sales;

    d. highest request rate;

    e. most scalp massages;

f.      most product sold;

g.      most waxes.

86.     On a daily basis Lady Janes requires reporting call offs and steps being taken for coverage.

87.     Defendants direct hairstylists to have all clients sign into Lady Janes' computers

88.     Defendants direct hairstylists that all services provided must be recorded in Lady Janes' computers.

89.     Defendants direct hairstylists all services must cashed out in Lady Janes' computers.

90.     Defendants direct hairstylists any "void" sales must be reported to Lady Janes.

91.     Defendants direct hairstylists that all voicemails be checked daily.

92.     Defendants direct hairstylists to send maintenance reports to 3 directors in the corporate office.

93.     Defendants direct hairstylists to submit schedules to 3 directors in the corporate office.

94.     Defendants direct hairstylists that all purchases made from petty cash must be approved by a Lady Janes' director.

95.     Defendants direct hairstylists that missing funds, client reimbursements, hairstylists reimbursements must be reported and approved.

96.     Defendants direct that "weekend" hairstylists schedules must be sent to 3 Lady Jane's directors.

97.     Defendants instruct that hairstylists who do not work full shift must be identified when the weekend schedule is sent to Lady Jane's directors.

98.     Defendants require the individual in charge on the weekend be designated in the report to Lady Jane's directors.

99.   Defendants approve or deny any hairstyle to be "on call."

100.  Defendants require monthly retail product inventory counts.

101.  Defendants require that display shelves be restocked.

102.  Defendants require reporting of discrepancies in product counts.

103.  Defendants require backbar retail product shelves be cleaned.

104.  Defendants require that styling products be replenished and ensure replacement.

105.  Defendants have a "supply order budget" and require orders be submitted by a monthly
      due date.

106.  Defendants require reporting of reasons why a hairstylist is leaving, the steps taken to
      retain the hairstylist, and determine whether they will remain on "roster."

107.  Defendants establish weekly and monthly performance benchmarks for hairstylists.

108.  Defendants require encourage meetings between hairstylist and the hairstylist designated
      as a manager by Lady Jane's.

109.  Defendants have store appearance expectations – including product display requirements,
      Lady Jane's lobby slideshow playing, store business license, store cosmetology license.

110.  Defendants require instruct hairstylists to follow "Opening the Salon" Procedures.

111.  Defendants communicated that Key holders were required to arrive 30-45 minutes before
      the doors open to the public to perform duties including:

      a.    Unlock door

      b.    Turn on

            i.    Towel warmers;

            ii.   Wax pot;

            iii.  Shaving cream dispensers;

        iv.    Computers

              1.    Enter log-ins

        v.    Televisions – sports or news

        vi.    Turn on lobby tv to run promotion

    c.    Open petty cash tracker;

    d.    Count and report petty cash;

    e.    Make sure every stylists activates;

    f.    Retrieve towels and fold for use.

112.    Defendants require that all hairstylists are "deactivated" when they leave for the day.

113.    Defendants instruct hairstylists to follow the written "Closing the Salon" Procedures.

114.    Defendants require hairstylists to generate "Salon Reports."

115.    Defendants require hairstylists to compare "Salon Reports" with hairstylists credit card receipts to discover and rectify any discrepancies, if any.

116.    Defendants require hairstylists to pay $1.00 for any hairstylists that did not sell $20.00 in product.

117.    Defendants' closing procedures requires hairstylists to turn off:

    a.    Computers;

    b.    Televisions;

    c.    Towel warmers;

    d.    Shaving cream dispenser;

    e.    Lights;

118.    Defendants require stylists to report the petty cash balance, after paying stylists.

119. Defendants require petty cash shortfalls greater than $5.00 be replaced by Keyholders or Managers.

120. Defendants require product count, including reporting product money collected that day.

121. Defendants require petty cash be placed into the safe.

122. Defendants require a final walk through, removal of trash, and locking of doors.

123. Defendants derive virtually all of its revenue from "rent" charged to its hairstylists.

124. Defendants take "rent" money from stylists by taking 60% of the money they earn for services performed, 86% on products sold, and charges the employees 3% for each credit card payment the hairstylist accept.

125. Defendants require hairstylists to answer phones during their shift and perform various posted manual labor assignments.

126. Defendants controls the services hairstylists may provide and the minimum price of those services. These prices are listed the shop walls for customers to see.

127. Defendants control the products hairstylists sell and the prices at which they must be sold.

128. All products are supplied by Lady Jane's, and Lady Jane's requires hairstylists to sell these products exclusively at prices determined by Lady Jane's.

129. Defendants have standardized rental agreements forhairstylist.

130. Defendants have standardized increases based on job duties and longevity.

131. Hairstylists perform services integral to Lady Jane's primary business.

132. Defendants do not have a policy, procedure, or practice of recording hairstylists time for the purpose of recording time and attendance.

133. Defendants do not have a policy, procedure, or practice of recording hairstylists time for the purpose of paying wages.

134. Defendants prohibit stylists from selling any products at their location, except for those provided by Defendant.

135. Defendants communicate to hairstylists that failure to work scheduled shifts may result in discipline, including but not limited to termination of their lease.

136. Hairstylists unlocks the doors, checks inventory, monitor time and attendance and perform other opening tasks.

137. Hairstylists lock the doors, disburses money to hairstylists, and perform other closing tasks.

138. Hairstylists perform laundry tasks and other cleaning tasks.

## PLAINTIFF PUGH'S TENURE WITH DEFENDANT

139. Defendant presented Plaintiffs with a document titled Independent Contractor Agreement.

140. Plaintiff Pugh's first tenure with Lady Jane's started approximately July 2020 and ended approximately December 2020.

141. Plaintiff Pugh's second tenure with Lady Jane's started approximately April 2021 and ended June 15, 2022.

142. Plaintiff Pugh primarily worked as a hairstylist at Lady Jane's Murfreesboro, Tennessee location.

143. Plaintiff Pugh has worked as a hairstylist at Lady Jane's Cool Springs, Tennessee location

144. During Plaintiff Pugh's second tenure with Lady Jane's she served as the "Salon Manager."

145. Plaintiff Pugh continued working as a hairstylist after she took the title of "Salon Manager."

146. Generally, Plaintiff Pugh was scheduled for 10-hour shifts.

147.    Generally, Plaintiff Pugh was scheduled for 3-4 to shifts per week, but would regularly work additional shifts.

148.    Plaintiff Pugh regularly worked in excess of 40 hours per week as hairstylist.

149.    Plaintiff Pugh regularly worked in excess of 40 hours per week when she was designated the "Salon Manager."

150.    Plaintiff Pugh had a routine of arriving approximately 30 minutes prior to her scheduled start time.

151.    During this pre-shift time Plaintiff Pugh would unlock the building, roll towels, fill towel warmers, turn televisions on, and other activities to ensure the salon was ready to serve customers when the doors opened to the public.

152.    Plaintiff Pugh would ensure that her workstation was stocked and ready to serve clients once the doors opened.

153.    Plaintiff Pugh would log-in to the computer and "activate" herself at some point during the morning.

154.    Plaintiff Pugh would "deactivate" for lunch breaks if she left the building.

155.    If Plaintiff Pugh did not leave the building for lunch, she remained engaged to wait should a customer arrive during her lunch, often not taking any meal break.

156.    Starting around October 31, 2021, Plaintiff Pugh became a "Salon Manager" of the Murfreesboro location.

157.    When Plaintiff Pugh was the Salon Manager, she would be reading and responding to text messages and e-mails from Defendants' corporate office and hairstylists before she arrived at the salon.

158. When Plaintiff Pugh was the Salon Manager, she would review e-mails from corporate to respond to any inquiries or take actions as directed.

159. While Plaintiff Pugh was out of the salon for family health reasons, she continued to work without compensation.

160. Specifically, corporate was insisting the Murfreesboro location remain open and stay staffed during a winter storm.

161. Defendants asked Plaintiff Pugh to find hairstylist to fill-in at other locations, including the Cool Springs and Hermitage locations.

162. Plaintiff Pugh was also responsible for ensuring that OC was turned on for hairstylists.

163. Plaintiff Pugh would organize contests to incentivize hairstylists to increase product sales.

164. As a salon manager, Plaintiff Pugh was responsible for ensuring promotional materials were displayed, stowed and stored for future use.

165. As a salon manager, Plaintiff Pugh was responsible for interviewing applicant hairstylists.

166. As a salon manager, Plaitniff Pugh was responsible for ensuring inventory was completed and submitted.

167. As a salon manager, Plaintiff Pugh was responsible for completing and submitting cash counts every Tuesday.

168. As a salon manager, Plaintiff Pugh was responsible for completing and submitting supply orders.

169. As a salon manager, Plaintiff Pugh was responsible for completing settlement reports.

170. Plaintiff Pugh would work after the normal operating hours.

171. Plaintiff Pugh would routinely stay beyond her scheduled end time, and after the salon's closing time, for 30 to 45 minutes, sometimes longer.

172.  Plaintiff Pugh would remain after the closing time, because she was still cutting hair, waiting for another hairstylist to cut hair, and to perform the checkout process for the remaining hairstylists.

173.  The checkout process required Plaintiff Pugh to review the sales reports, reconcile the credit card and cash sales with the settlement reports from the point-of-sale system, before paying each hairstylists.

174.  This process could be prolonged if there was any sort of discrepancy.

175.  Plaintiff Pugh stayed after the salon's normal operating hours, on numerous occasions because the credit card total did not match the ticket totals in the point-of-sale system.

176.  Victoria Franz routinely monitored the number of hairstylists at location and send text messages asking Salon Managers about staffing.

177.  For example, Franz sent Plaintiff Pugh questions about why there were only 2 hairstylists activated at the location or why a particular hairstylist had left "early."

178.  Defendants required Plaintiff Pugh to respond to inquiries and follow-up with hairstylists even on days Pugh was not scheduled to work at the Salon.

179.  At some point after becoming the Salon Manager, Plaintiff Pugh modified the scheduled so that there would be three waves of stylists: (1) openers; (2) mid-shift; and (3) closers.

180.  The openers and the mid-shift would leave before closing, while the closer would start after the doors opened to the public, and would leave after the salon closed.

181.  Hairstylists complied with the Lady Janes' control, including working entire 10-hour shifts.

182. However, certain Hairstylists began to ignore Defendants' control after they received their 1099s, and Defendants refused to provide the total amount of money Defendants charged for (1) booth rents; and (2) credit card service fees.

183. Hairstylists wanted this information so that they could claim the expenses when filing taxes.

184. In February 2022, Plaintiff Pugh communicated to Defendants that hairstylists felt they were being treated as employees as opposed to booth renters, and she considered their points valid.

185. On or about March 27, 2022, McCollum and Franz convened a mandatory after-hours meeting with hairstylists at the Murfreesboro location.

186. None of the hairstylists were paid for attending the meeting.

187. During the meeting, Plaintiff reported she was not being compensated for all hours worked as a manager.

188. During the meeting, Plaintiff Pugh opposed Defendants classifying hairstylists as "independent contractors" but treating them as employees.

189. During the meeting, Plaintiff Pugh complained about hairstylists being required to remain at the shop without clients, not receiving minimum wage, and being called independent contractors.

190. Plaintiff Pugh complained that she was only getting paid when she was cutting hair, and not for performing the "Salon Manager" duties.

191. Defendant McCollum stated he was aware that Salon Managers felt the pressure to work on finding fill-ins during the weekend.

192. Plaintiff Pugh complained about the excessive amount of work she performed outside the Salon to keep it together and not being paid for it.

193. Plaintiff Pugh asserted that true independent contractors are supposed to be able to set their own prices, not the salon set the price and the whole salon agree to it.

194. Defendant McCollum stated he did not understand why everyone was having a "tizzy."

195. In April 2022, corporate manager called Plaintiff Pugh and told her that she was required to work 5 days per week and expressed her dissatisfaction that Pugh was on an 8-hour shift, versus 10-hour shift.

196. During this call, supposedly about hiring a co-manager, questions began being focused on whether she was happy being a manager.

197. In May 2022, Plaintiff Pugh learned that Defendants recruited 2 others hairstylist to serve as her replacement as "Salon Manager."

198. In May 2022, Defendant began recruiting hairstylists who were told they were required to work full shifts and they do not get to choose their hours.

199. Plaintiff Pugh lost her additional override pay.

200. Plaintiff Pugh was also now required to pay 3% credit card fees.

201. Plaintiff Pugh was told she could not receive O.C. pay for Sunday if she left early.

202. The manager that replaced Plaintiff Pugh terminated a hairstylist for failing to show up to shift.

203. On June 14, 2022, Defendant's Director of Salon Operations Victoria Franz sent a text message asking Plaintiff Pugh to report to work prior to the Salon opening.

204. On June 15, 2022, Plaintiff Pugh reported at her scheduled start time.

205. On June 15, 2022, Operations Manager Franz was sitting in the "break room" and after Pugh sat her bag down, Franz said "effectively immediately" we are terminating your contract.

206. Plaintiff Pugh asked for an explanation, and Franz responded that Lady Jane's can terminate her contract "without reason."

207. Plaintiff Pugh retrieved her belongings from her workstation and left.

208. Plaintiff Pugh never received a wage from Defendants.

209. Plaintiff Pugh never received overtime pay for hours worked in excess of forty hours per week.

## PLAINTIFF LEES'S TENURE WITH DEFENDANT

210. Defendant presented Plaintiff Lees with a document titled Independent Contractor Agreement upon hire.

211. Plaintiff Lees's first tenure with Lady Jane's started approximately March 2018 and ended approximately March 2020.

212. Plaintiff Lees's second tenure with Lady Jane's started approximately March 2021 and ended February 2022.

213. Plaintiff Lees primarily worked as a hairstylist at Lady Jane's Murfreesboro, Tennessee location.

214. Plaintiff Lees has worked as a hairstylist at both Lady Jane's Murfreesboro and Lady Jane's Cool Springs location

215. During Plaintiff Lees's second tenure with Lady Jane's she served as a "Key Holder."

216. Generally, Plaintiff Lees was scheduled for 10-hour shifts.

217. Generally, Plaintiff Lees was scheduled for 3-4 to shifts per week, but would regularly work additional shifts.

218. Plaintiff Lees regularly worked in excess of 40 hours per week as hairstylist.

219. Plaintiff Lees regularly worked in excess of 40 hours per week when she becaome a "Key Holder."

220. Plaintiff Lees had a routine of arriving approximately 30 minutes prior to her scheduled start time.

221. During this pre-shift time Plaintiff Lees would unlock the building, roll towels, fill towel warmers, turn televisions on, and other activities to ensure the salon was ready to serve customers when the doors opened to the public.

222. Plaintiff Lees would ensure that her workstation was stocked and ready to serve clients once the doors opened.

223. Plaintiff Lees would log-in to the computer and "activate" herself at some point during the morning.

224. Plaintiff Lees would "deactivate" for lunch breaks if she left the building.

225. If Plaintiff Lees did not leave the building for lunch, she remained engaged to wait should a customer arrive during her lunch, often not taking any meal break.

226. Plaintiff Lees resigned in February of 2022.

### PLAINTIFF ELLIOTT'S TENURE WITH DEFENDANT

227. Defendant presented Plaintiff Elliott with a document titled Independent Contractor Agreement upon hire.

228. Plaintiff Elliott's tenure with Lady Jane's started approximately August 2018 and ended approximately February 2022.

229. Plaintiff Elliott primarily worked as a hairstylist at Lady Jane's Cool Springs, Tennessee location from early 2019 through January 2020.

230. Plaintiff Elliott was a manager at the Cool Springs location from June 2019 through January 2020.

231. Plaintiff Elliott worked exclusively as a hairstylist at Lady Jane's Murfreesboro, Tennessee location from January 2020 to February 2022.

232. During Plaintiff Elliott's second tenure with Lady Jane's she served as the "Salon Manager."

233. Generally, Plaintiff Elliott was scheduled for 10-hour shifts.

234. Generally, Plaintiff Elliott was scheduled for 3-4 to shifts per week, but would regularly work additional shifts.

235. Plaintiff Elliott regularly worked in excess of 40 hours per week as hairstylist.

236. Plaintiff Elliott regularly worked in excess of 40 hours per week when she was designated the "Salon Manager."

237. Plaintiff Elliott had a routine of arriving approximately 30 minutes prior to her scheduled start time.

238. During this pre-shift time Plaintiff Elliott would unlock the building, roll towels, fill towel warmers, turn televisions on, and other activities to ensure the salon was ready to serve customers when the doors opened to the public.

239. Plaintiff Elliott would ensure that her workstation was stocked and ready to serve clients once the doors opened.

240. Plaintiff Elliott would log-in to the computer and "activate" herself at some point during the morning.

241.  Plaintiff Elliott would "deactivate" for lunch breaks if she left the building.

242.  If Plaintiff Elliott did not leave the building for lunch, she remained engaged to wait should a customer arrive during her lunch, often not taking any meal break.

243.  Plaintiff Elliot resigned in February of 2022.

V.  **CAUSES OF ACTION**

**Count I: FLSA minimum wage violation**

244.  Plaintiffs hereby incorporate by reference each of the allegations in paragraphs 1 through 213 above.

245.  At all times material to this action, Defendants were an "employer" of the Plaintiffs as defined by §203(d) of the FLSA.

246.  Defendants operated as a single integrated entity, in the alternative, Defendant Lady Janes Holding Co. operated as joint-employers with each of its "affiliates."

247.  At all times material to this action, Plaintiffs were "employees" of Defendants as defined by §203(e)(1) of the FLSA.

248.  At all times material to this action, Defendants are an enterprise engaged in commerce or in the production of goods for commerce as defined §203(s)(1) of the FLSA.

249.  Defendants' policies and practices misclassifying Plaintiffs as "independent contractors" violated the minimum wage provisions of the FLSA.

250.  Defendants failed to record all hours Plaintiffs worked in violation of the FLSA's record keeping requirements.

251.  Defendants failed to pay Plaintiffs at least the federal mandated minimum wage for hours worked up to forty hours in a workweek.

252. Plaintiffs are entitled to $7.25 per hour for every hour worked up to 40 hours in a workweek.

253. Defendants are liable for unpaid wages and an equal amount as liquidated damages.

254. Defendants intentionally failed and or refused to pay Plaintiffs according to the provisions of the Fair Labor Standards Act.

255. Defendants' actions in failing to compensate Plaintiffs in accordance with the provisions of the FLSA was willful, so a three-year statute limitation should apply to this action.

256. Defendants are liable for reasonable attorneys' fees and costs.

## Count II. FLSA overtime compensation violation

257. Plaintiffs hereby incorporate by reference each of the allegations in paragraphs 1 through 226 above.

258. At all times material to this action, Defendants were an "employer" of the Plaintiffs as defined by §203(d) of the FLSA.

259. At all times material to this action, Plaintiffs were "employees" of Defendants as defined by §203(e)(1) of the FLSA.

260. At all times material to this action, Defendants were, and are, an enterprise engaged in commerce or in the production of goods for commerce as defined §203(s)(1) of the FLSA.

261. Defendants failed to pay Plaintiff at least "time-and-a-half" the federal mandated minimum wage in excess of forty (40) hours a week.

262. Defendants are liable for unpaid overtime compensation and an equal amount as liquidated damages.

263. Defendants intentionally failed and or refused to pay Plaintiff according to the provisions of the Fair Labor Standards Act.

264. Defendants' actions and failing to compensate plaintiff in accordance with the provisions of the FLSA was willful so that a three-year statute limitation should apply to this action.

265. Defendants are liable for reasonable attorneys' fees and costs.

## Count III. Retaliation as Prohibited by 29 U.S.C. 215(a)

266. Plaintiffs hereby incorporate by reference each of the allegations in paragraphs 1 through 235 above.

267. Defendants retaliated against Plaintiff Pugh for asserting FLSA rights, violating 29 U.S.C. § 215(a)(3).

268. Plaintiff Pugh engaged in protected activity under the FLSA.

269. Plaintiff Pugh engaged of protected activity by making verbal and written complaints.

270. Plaintiff Pugh engaged in protected activity by reporting she was not being paid for all hours worked.

271. Plaintiff Pugh engaged in protected activity by objecting to Defendant exerting control over hairstylists while claiming they were independent contractors.

272. Plaintiff Pugh asserted a violation of her own FLSA rights as a hairstylist.

273. Plaintiff Pugh asserted a violation of her own FLSA rights as "salon manager."

274. Plaintiff Pugh asserted a violation of other hairstylists FLSA rights while she was a stylist.

275. Plaintiff Pugh asserted a violation of other hairstylists FLSA rights while she was a "store manager."

276. Plaintiff Pugh communicated hairstylists opposition to Lady Janes control without pay.

277. Defendants were aware that Plaintiff Pugh was engaging in protected activity.

278. After Plaintiff Pugh engaged in protected activity Defendants terminated Plaintiff Pugh's employment.

279. Defendants' decision to terminate Plaintiff Pugh is causally connected to Plaintiff Pugh's protected activity.

280. Defendants' proffered reason for terminating Plaintiff Pugh's relationship has no factual basis.

281. Defendants' proffered reason for terminating Plaintiff Pugh did not actually motivate Defendants' action.

282. Defendants' proffered reason for terminating Plaintiff Pugh was insufficient to motivate the action.

283. Defendants proffered reason for terminating Plaintiff Pugh is mere pretext intended to hide retaliatory motive.

284. Defendants are liable for lost wages, including back pay, front pay, lost tips, lost commissions and an equal amount in liquidated damages.

285. Defendants are liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3), including without limitation employment, reinstatement, promotion, (front pay if reinstatement unavailable) and payment of wages lost and additional equal amount as liquidated damages.

286. Plaintiff Pugh seeks to recover an award of legal relief to include compensatory damages for pain and suffering, distress for losing her job and punitive damages.

## VI.    PRAYER FOR RELIEF

WHEREFORE, premises considered, the named, AUBRAY PUGH, OLIVIA LEES, and CASSIDY ELLIOTT, individually, and on behalf of all other similarly situated persons, pursuant to 29 U.S.C. § 216(b), pray for the following relief:

1. that process issue against Defendants and that the Defendants be required to answer within the time period provided by applicable law;

2. be awarded damages in the amount of their unpaid wages, and an additional equal amount as liquidated damages pursuant to 29 U.S.C. § 216(b), and/or prejudgment interest;

3. lost wages, including back pay, front pay, lost tips, lost commissions and an equal amount in liquidated damages;

4. legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3), including without limitation employment, reinstatement, promotion, (front pay if reinstatement unavailable) and payment of wages lost and additional equal amount as liquidated damages;

5. Plaintiffs seek to recover an award of legal relief to include compensatory damages for pain and suffering, distress for losing her job and punitive damages'

6.  that Defendants be required to pay Plaintiffs' attorneys' fees;

7. that Defendants be required to pay the costs and expenses of this action;

8. that Plaintiffs and all others who join this action be granted such other, further and general relief to which they may show themselves entitled; and,

9. that a jury be impaneled to hear this cause of action at trial

## VII.   JURY DEMAND

THE PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY.

/s/ Daniel E. Arciniegas
Daniel E. Arciniegas
**ARCINIEGAS LAW**
The Atrium Building
1242 Old Hillsboro Rd.
Franklin, TN 37069
Phone: 629-777-5889
Daniel@AttorneyDaniel.com
AttorneyDaniel.com

*Attorney for Plaintiffs*

/s/ David Weatherman
David Weatherman
**THE WEATHERMAN FIRM**
The Atrium Building
1242 Old Hillsboro Rd.
Franklin, TN 37069
Phone: 615-538-7555
Daniel@AttorneyDaniel.com
AttorneyDaniel.com

*Attorney for Plaintiffs*