# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| AUBRAY PUGH, OLIVIA LEES, and CASSIDY ELLIOTT,<br><br>   Plaintiffs,<br><br>v.<br><br>LADY JANE'S HAIRCUTS FOR MEN HOLDING COMPANY, LLC; LADY JANE'S MURFREESBORO TN, LLC; and LADY JANE'S NASHVILLE–COOL SPRINGS TN, LLC, MICHIGAN,[1]<br><br>   Defendants. | )<br>)<br>)<br>)<br>)<br>)   **Case No. 3:22-cv-00556**<br>)   **Judge Aleta A. Trauger**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM

Before the Court is the Motion to Dismiss or, In the Alternative, Motion to Stay and Compel Arbitration (Doc. No. 13) filed by defendants Lady Jane's Haircuts for Men Holding Company, LLC, Lady Jane's Murfreesboro TN, LLC ("Lady Jane's Murfreesboro"), and Lady Jane's Nashville–Cool Springs TN, LLC ("Lady Jane's Cool Springs"). (Doc. No. 13.) The plaintiffs do not dispute that they signed contracts containing arbitration provisions, but they oppose the motion on the grounds that the underlying arbitration provisions are unenforceable. For the reasons that follow, the defendants' motion to dismiss for lack of subject matter jurisdiction will be denied, but the alternative motion to compel arbitration and stay the case pending such arbitration will be granted.

---

[1] The plaintiff's inclusion of "Michigan" in the case caption of the Complaint appears to be an error.

## I.       BACKGROUND

According to the Complaint initiating this action (Doc. No. 1), the defendants operate over ninety hair salons for men around the country, and they engage hairstylists to perform hairstyling services at these salons. The plaintiffs formerly were engaged as hairstylists at salons operated by Lady Jane's Murfreesboro and/or Lady Jane's Cool Springs. The Complaint alleges that each plaintiff signed an Independent Contractor Agreement ("ICA") that characterizes them as independent contractors. The plaintiffs contend, however, that they were improperly characterized as independent contractors and were actually employees, as that term is defined by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203. All three plaintiffs bring claims for alleged violations of the FLSA's minimum wage and overtime pay provisions; plaintiff Pugh also asserts a claim for retaliatory termination in violation of the FLSA's anti-retaliation provision.

Rather than answering the Complaint, the defendants filed their Motion to Dismiss or, In the Alternative, Motion to Stay and Compel Arbitration and supporting Memorandum (Doc. Nos. 13, 13-1), along with the Declaration of Victoria Franz, the Director of Operations for all three defendants (Doc. No. 13-2). Attached to Franz's Declaration are copies of the ICAs signed by the plaintiffs, each of which contains a paragraph titled "Arbitration" (hereafter, "arbitration agreement" or "arbitration provision") that (1) requires the plaintiffs and the defendants to use binding arbitration administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules ("AAA Commercial Rules") to pursue all covered claims, which are defined to include claims relating to the relationship between the parties to the agreement, claims for wrongful discharge and retaliation, and any claims related to wages, overtime, and other remuneration; (2) expressly states that both parties to the ICA waive their right to a jury trial; (3) states that the question of the arbitrability of any claim is to be addressed by the arbitrator; and (4) bars the arbitrator from combining the claims of more than one contractor in any single proceeding.

(Doc. No. 13-2, at 7–8, 14–15, 21–22 (ICA ¶ 11).) The arbitration agreement also provides that the presiding arbitrator "shall apply the substantive law that is applicable to the claims" and has "the power to award all remedies that could be awarded by a court or administrative agency under applicable statutory or common law." (ICA ¶ 11.) The jury-trial waiver language is in bold-face type. (*Id.*)

On the basis of the arbitration provision in each plaintiff's IAC, the defendants move the court to dismiss the case for lack of subject matter jurisdiction or, alternatively, to stay the case and issue an order compelling each plaintiff to pursue individual arbitration of her claims. (Doc. No. 13; Doc. No. 13-1, at 2.) The defendants specifically assert that (1) the arbitration agreements are binding and enforceable under Tennessee law or Michigan law, are supported by evidence of an explicit offer and acceptance, consideration, and mutual assent, and clearly apply to the FLSA wage-related and retaliation claims raised in the Complaint; (2) courts within the Sixth Circuit have repeatedly held that FLSA claims may be subject to arbitration; and (3) the plaintiffs clearly waived their right to bring a collective action in one lawsuit or a single arbitration. The defendants further contend that the court should dismiss the Complaint with prejudice. Alternatively, they ask the court to compel arbitration and stay this case pending resolution of the arbitration proceedings.

The plaintiffs, in response, do not deny that they each signed an IAC that contains an arbitration provision. Instead, they argue that the arbitration provision is unenforceable under state law for a variety of reasons, but particularly, because the AAA Commercial Rules incorporate a "cost-splitting rule" that would effectively require the plaintiffs to bear one-half of the costs of arbitration. They contend that the cost-splitting rule was not disclosed to the plaintiffs and has a "chilling effect on vindicating federal rights." (Doc. No. 18, at 1.) They also argue that, because this cost-splitting requirement was not disclosed to the plaintiffs, there was no mutual assent and

meeting of the minds necessary for the formation of a binding contract to arbitrate and that the provision is unconscionable and fails for lack of consideration. They also argue that the IACs are contracts of adhesion that contain other unreasonably harsh terms and, consequently, that the IACs as a whole are unenforceable. They also ask that, if the court compels arbitration, it stay this case instead of dismissing it in its entirety.

The defendants filed a Reply (Doc. No. 24), asserting that the plaintiffs mischaracterize the AAA Commercial Rules and fail to show that arbitration would be prohibitively expensive. Alternatively, they argue that the court can sever any cost-splitting provision. They also dispute the plaintiffs' contention that the arbitration agreement lacks mutual assent or consideration or that it is procedurally or substantively unconscionable.

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") allows parties to a "contract evidencing a transaction involving commerce" to agree that certain disputes between them arising from such "contract or transaction" will be decided by an arbitrator rather than by a court. 9 U.S.C. § 2. Described by the Supreme Court as the "primary substantive provision" of the FAA, *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), Section 2 further provides that any such agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section embodies "a liberal federal policy favoring arbitration." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quoting *Moses H. Cone*, 460 U.S. at 24). The principal purpose of the FAA is to ensure the enforcement of private arbitration agreements according to their terms. The broader purpose of allowing parties to submit grievances to arbitration is to facilitate "efficient, streamlined procedures tailored to the type of dispute" at issue. *Id.* at 344 (citations omitted); *see also Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000) ("The FAA was designed to override judicial

reluctance to enforce arbitration agreements, to relieve court congestion, and to provide parties with a speedier and less costly alternative to litigation.").

At the same time, despite this liberal federal policy favoring arbitration agreements, arbitration is a "matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986); *see also GGNSC Louisville Hillcreek, LLC v. Estate of Bramer*, 932 F.3d 480, 485 (6th Cir. 2019) ("An agreement to arbitrate is fundamentally a matter of consent."). When considering a motion to compel arbitration, a district court must determine, as a threshold matter, if the parties agreed to arbitrate. *McGee v. Armstrong*, 941 F.3d 859, 865 (6th Cir. 2019); *Stout*, 228 F.3d at 714. The court must "use state law to assess the existence of an agreement." *GGNSC Louisville*, 932 F.3d at 485 (citations omitted).

## III.    ANALYSIS

### A.    Choice of Law

Each IAC contains a clause that states: "Except as provided under Section 11 of this Agreement [the arbitration clause], this Agreement shall be governed by the laws of the State of Michigan without reference to principles of conflict of laws." (*See* IAC ¶ 8, Doc. No. 13-2, at 6.) The defendants assert, without highlighting any distinction between Michigan and Tennessee contract law, that the arbitration provisions are enforceable under the laws of both states. (*See* Doc. No. 13-2, at 9, 10.) Although they cite to two Michigan state court cases, the defendants' Memorandum relies primarily on federal and Tennessee law.

In the absence of any indication of a "real conflict between or among the relevant laws of the various states," *Gov't Employees Ins. Co. v. Bloodworth*, No. M2003-02986-COAR10CV, 2007 WL 1966022, at *29 (Tenn. Ct. App. June 29, 2007), the court finds it unnecessary to conduct a conflict-of-laws analysis. That is, while the choice of law rules of Tennessee, as the forum state,

would apply to resolve whether Michigan's or Tennessee's laws apply to this case, "a conflict between the laws of the states at issue is a necessary predicate to deciding which state's (or states') laws should govern the various issues presented in the case." *Id.* (citing *Hataway v. McKinley*, 830 S.W.2d 53, 55 (Tenn. 1992)); *accord Lemons v. Cloer*, 206 S.W.3d 60, 64–65 (Tenn. Ct. App. 2006) (before embarking on choice of law analysis, the court must first "determine if there is, in fact, a conflict of laws" (citing *Hataway*, 830 S.W.2d at 55)).

Because there is no apparent conflict between the contract law of Michigan and Tennessee, the court will apply the law of Tennessee, as the forum state. *Accord Gov't Employees*, 2007 WL 1966022, at *29 ("Where there is only a false conflict, the court may ignore choice of law questions and apply forum law." (citing *Portland Trailer & Equip., Inc. v. A-1 Freeman Moving & Storage, Inc.*, 49 P.3d 803, 806 (Or. Ct. App. 2002)).

## B. Delegation of the Question of Arbitrability

Generally, "whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide." *In re: Auto. Parts Antitrust Litig.*, 951 F.3d 377, 381 (6th Cir. 2020) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). However, the parties may instead "agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Id.* at 381–82 (quoting *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019)). Such an agreement, referred to as a "delegation provision," "is simply an additional, antecedent agreement" "to arbitrate a gateway issue," which "the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 382 (quoting *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010)). To be effective, a delegation provision must "clearly and unmistakably" show that the parties intended the question of arbitrability to be

decided by the arbitrator. *McGee v. Armstrong*, 941 F.3d 859, 865–66 (6th Cir. 2019) (quoting *Howsam*, 537 U.S. at 83).

The AAA Commercial Rules that are incorporated by reference into the plaintiffs' IACs themselves incorporate a rule providing that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA Commercial Rule 7(a) (Oct. 1, 2013), available online at adr.org/commercial.[2] The Sixth Circuit has recently held that an agreement that incorporates the AAA Commercial Rules constitutes "clear and unmistakable evidence" that the parties agreed to arbitrate "arbitrability." *Blanton v. Domino's Pizza Franchising LLC*, 962 F.3d 842, 845 (6th Cir. 2020).

It appears that *Blanton*'s holding would apply in this case, but for the defendants' failure to make this argument; instead, the defendants ask the court to resolve the question of arbitrability. The Supreme Court has recently emphasized that the same waiver rules that apply to contracts generally also apply to arbitration agreements. *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1711 (2022). The court finds that, by failing to preserve this argument, the defendants have waived the ability to require the question of arbitrability to be resolved by an arbitrator. The court, therefore, will proceed to consider the enforceability of the arbitration agreement.

### C. Enforceability of the Cost-Shifting Provision

The primary focus of the plaintiffs' objection to arbitration is the cost-splitting provision of the AAA Commercial Rules. They contend that this provision has a "chilling effect" on the

---

[2] Neither party addresses whether the AAA Commercial Rules that went into effect on October 1, 2013 or those that went into effect on September 1, 2022 would govern this dispute, but they both cite to the older version, so the court does as well. Although several rules were renumbered, any substantive differences between the two versions are not material here.

vindication of federal rights, was not disclosed to the plaintiffs, and is not severable, thus rendering the entire arbitration agreement unenforceable.

AAA Commercial Rule 47 directs the arbitrator, in issuing a final award, to "assess the fees, expenses, and compensation provided" in Rules 53, 54, and 55 and authorizes the arbitrator to "apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate." AAA Commercial Rule 47(c) (2013). Rule 53 provides that the filing fees in effect when a fee or charge is incurred are applicable and that the filing fee is to be "advanced" by the party making the claim, "subject to final apportionment by the arbitrator in the award." The filing fee is based on the value of the claim, with a minimum initial filing fee of $925 for claims valued at less than $75,000, but $7,700 for "Undetermined Monetary Claims" and $3,500 for "Nonmonetary Claims." *See* https://www.adr.org/sites/default/files/Commercial_Arbitration_Fee_Schedule_1.pdf (accessed Mar. 6, 2023). However, Rule 53 also states that "[t]he AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees." AAA Commercial Rule 53 (2013). The AAA's website includes a link to a form Affidavit in Support of Administrative Fees Hardship Waiver, which notes that the decision of whether to waive filing fees depends primarily upon the federal poverty guidelines and that, absent additional supporting information, "individuals whose gross monthly income exceeds 300% of the federal poverty guidelines will not likely receive approval to have the AAA's fees waived." https://www.adr.org/sites/default/files/Support_of_Hardship_Waiver_of_Fees_1.pdf.

Rule 54, pertaining to expenses, provides a default rule for the costs of the arbitrator to be "borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses . . . against any specified party or parties." Rule 56 authorizes the arbitrator, at his or her sole discretion, to "require the parties to deposit in advance of any hearings such sums

of money as it deems necessary to cover the expense of the arbitration, including the arbitrator's fee." AAA Commercial Rule 56(a) (2013). Under Rule 57, the arbitrator may suspend or terminate arbitration for failure to pay the administrative fees or deposits for arbitrator compensation.

All three plaintiffs have submitted Declarations in which they attest that they have high school diplomas but no college degrees, did not know what arbitration was when they signed the ICAs, did not know the AAA Commercial Rules included a default rule requiring the parties to bear the costs of arbitration equally, and "are not in the economic position to pay any money to pursue a claim." (Doc. No. 19-1 ¶ 19; Doc. No. 19-2 ¶ 14; Doc. No. 19-3 ¶ 14.) Plaintiff Pugh adds that she has four children under age 18, and her gross earnings from Lady Jane's in 2021 were $23,849. (Doc. No. 19-1 ¶¶ 18, 20.)[3]

Federal courts, including the United States Supreme Court, have found that, in some types of cases, an arbitration provision may not be enforceable if the costs of arbitration are prohibitively expensive and thus prevent vindication of a party's rights. In *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000), the Supreme Court recognized that the costs of arbitration could be large enough to preclude a claimant from enforcing a right in the arbitral forum, making such an arbitration agreement unenforceable. There, however, the Court held that, "when a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* at 92. The Court found that the fact that the agreement was silent as to the costs of arbitration was not sufficient to establish cost prohibitiveness and that there was no proof that the cost of arbitration of the claim at issue would be any greater than the cost of litigation. *Id.* Thus, unless a plaintiff

---

[3] If that figure represents Pugh's gross household income for 2021, it would fall below the 2021 federal poverty guideline for a household of five. *See* https://aspe.hhs.gov/2021-poverty-guidelines.

proves that the costs of arbitration are prohibitively high, "the 'risk' that [the plaintiff] will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Id.*

In *Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646 (6th Cir. 2003), the Sixth Circuit explained that the Supreme Court had made "clear that statutory rights . . . may be subject to mandatory arbitration only if the arbitral forum permits the effective vindication of those rights." *Id.* at 658 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991)). Consequently, a cost provision that effectively prevents vindication of a statutory right through arbitration makes the arbitration agreement unenforceable. *Id.* The Sixth Circuit adopted a test for cost-prohibitiveness that deviates from a strict case-by-case analysis. The court held, instead, that "potential litigants must be given an opportunity, prior to arbitration on the merits, to demonstrate that the potential costs of arbitration are enough to deter them *and similarly-situated individuals* from seeking to vindicate their federal statutory rights in the arbitral forum." *Id.* at 663 (emphasis added). The court determined that basically any cost provision, including one providing for cost-splitting depending on the result of the arbitration, is unenforceable if it would have a "chilling effect" that deterred enforcement of federal statutory rights. *Id.* at 661.

The court also reiterated the need for courts reviewing challenges to cost provisions to evaluate the likely cost of arbitration relative to the likely costs of litigation. Addressing the kind of proof that a party opposing arbitration should be required to produce, the court noted that "requiring the plaintiff to come forward with concrete estimates of anticipated or expected arbitration costs asks too much at this initial stage of the proceedings." *Id.* at 660. Similarly, the court believed that the effects or results of a cost-shifting provision if the claimant is successful were also too difficult to prove during the early stages of a litigation, when a plaintiff typically

seeks to have an arbitration provision invalidated. *Id.* Nonetheless, the court found that the expenses of arbitrating typical employment-related claims may "range from three to nearly fifty times the basic costs of litigation in a judicial, rather than arbitral, forum." *Id.* at 669 (citing *Public Citizen*, The Costs of Arbitration 40–42 (2002)). Additionally, the court cautioned that the relative costs of litigation and arbitration should be weighed "in a realistic manner" and that the comparison must be made "from the perspective of the potential litigant," meaning that the court must "consider the decision-making process of these potential litigants." *Id.* at 663–64. The court explained that the courts should consider, not simply the individual plaintiff's resources, but the relative income of similarly situated employees. *Id.* at 665.

Following *Morrison*, in *Cooper v. MRM Investment Co.*, 367 F.3d 493 (6th Cir. 2004), the Sixth Circuit again emphasized that up-front costs must be considered, because such costs are a driving consideration for a claimant's decision whether to pursue arbitration:

> [T]he analysis of likely arbitration costs must consider only "up-front" costs, not the lower cost that may ultimately result if the arbitrator relieves the employee of costs presumptively imposed by AAA rules (*e.g.*, if the employee prevails on the merits). After all, it is the out-of-pocket costs an employee considers when deciding whether he can afford arbitration. . . .
>
> In many cases, if not most, employees considering the consequences of bringing their claims in the arbitral forum will be inclined to err on the side of caution, especially when the worst-case scenario would mean not only losing on their substantive claims but also the imposition of the costs of the arbitration.

*Id.* at 511 (internal quotation marks and citations to *Morrison* omitted).

Finally, in *Mazera v. Varsity Ford Management Services, LLC*, 565 F.3d 997, 1003 (6th Cir. 2009), the court addressed the validity of an arbitration agreement that included a provision requiring the claimant to make a $500 deposit for arbitration costs at the outset of the proceedings. Even though the court agreed with the district court that this figure was prohibitively expensive in light of the plaintiff's financial situation and, therefore, unreasonable, the court held that a

provision in the arbitration agreement that "permits [the plaintiff] to request a waiver of the deposit save[d] the agreement." *Id.* at 1004. Because counsel for the defendant represented at oral argument that such a request would likely be granted, and the court also "suspect[ed] that [the defendant] would seriously entertain such a request" in light of the significant cost-savings arbitrations afford employers, the court found that the likelihood that the defendant would waive or reduce "the deposit amount for those employees who are likely to be deterred from pursuing their rights because they are unable to pay it, the provision would not run afoul of *Morrison*'s prohibition." *Id.* In reaching that conclusion, the court emphasized that, "[w]here . . . a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Id.* (quoting *Morrison*, 317 F.3d at 659).

Applying *Mazera* here, it is clear that AAA's administrative fee, *per se*, would not serve to dissuade the plaintiffs or similarly situated claimants from vindicating their rights, because the AAA permits applicants to seek a waiver of the fee and strongly suggests on the face of the form Affidavit in Support of Administrative Fees Hardship Waiver that individuals who earn less than 300% of the federal poverty guidelines will likely be granted relief. The plaintiffs have not presented any proof that they would *not* have been granted a waiver if it had been requested. The court finds this provision, *per se*, would not be unenforceable under *Morrison*.

The waiver affidavit, however, expressly limits its application to the filing fee and does not affect the applicant's "separate obligation to pay arbitrator compensation." https://www.adr.org/sites/default/files/Support_of_Hardship_Waiver_of_Fees_1.pdf, at 2. Arbitrator compensation is governed by Rules 54 and 56, which, as set forth above, embody a presumption that such fees are to be borne equally by the parties and permit the arbitrator to require

a deposit of anticipated fees at the outset of the proceedings. The plaintiffs have adequately supported their assertions that these requirements would deter them and similarly situated individuals in their field from pursuing litigation.

Moreover, a quick Google search suggests that the median income for hair stylists in the United States in 2021 was less than $30,000, with the lowest 25% averaging approximately $24,000 and the highest 25% making less than $39,000 annually. *See* https://money.usnews.com/careers/best-jobs/hairdresser/salary. The median hourly wage for hairdressers, according to federal statistics for 2020, was $13.16. *See* https://www.bls.gov/oes/2020/may/oes395012.htm. Twenty years ago, when *Morrison* was decided, the plaintiff cited an estimate by the AAA that the average arbitrator fee was $700 per day and that an average employment case incurred a total of $3,750 to $14,000 in arbitration expenses. *Morrison*, 317 F.3d at 669. The court recognized at that time that costs were only likely to go up—and they clearly have. A report published by the *ADR Times* in June 2022 indicates that arbitrators now charge between $375 and $1,125 per hour, *see* https://www.adrtimes.com/how-much-does-arbitration-cost/, meaning that the arbitrator's total fees could range from $5,000 to $45,000.[4] Proceeding in a judicial forum would avoid this expense altogether.

The court finds that the possibility of having to pay half these costs would deter the plaintiffs and most hair stylists—and especially those individuals at the lower end of the income range—from vindicating federal rights protected by the FLSA. In light of this "chilling effect" on the vindication of important rights protected by the federal statute, the cost-splitting provision is unenforceable. *See Morrison*, 317 F.3d at 661. Further, the possibility that the defendants might

---

[4] In *Morrison*, the court noted that "a typical employment discrimination arbitration involves between fifteen and forty hours of arbitrator time." *Morrison*, 317 F.3d at 676 (citation omitted).

ultimately agree to bear more than half of the costs or that the arbitrator might assess the costs against the defendants does not serve to rehabilitate the provision. As the Sixth Circuit stated in *Morrison*, courts "should not consider after-the-fact offers by employers to pay the plaintiff's share of the arbitration costs where the agreement itself provides that the plaintiff is liable, *at least potentially*, for arbitration fees and costs." *Id.* at 676 (emphasis added).

Here, the plaintiffs would be at least potentially liable and could be required to deposit half of the anticipated costs in advance. "When the cost-splitting provision is in the arbitration agreement, potential litigants who read the arbitration agreement will discover that they will be liable, potentially, for fees if they bring their claim in the arbitral forum and thus may be deterred from doing so." *Id.* at 677; *accord Cooper*, 367 F.3d at 511 ("In many cases, if not most, employees considering the consequences of bringing their claims in the arbitral forum will be inclined to err on the side of caution, especially when the worst-case scenario would mean not only losing on their substantive claims but also the imposition of the costs of the arbitration." (quoting *Morrison*, 317 F.3d at 665)).

Accordingly, the court finds that the arbitration provision in the ICA is unenforceable insofar as it incorporates by reference the AAA Commercial Rules, and particularly Rules 54 and 56. This conclusion renders the arbitration provision unenforceable unless the cost-splitting provision is somehow severable from the rest of the agreement. *Morrison*, 317 F.3d at 674 ("[W]e must determine whether those [unenforceable cost-splitting] provisions are severable from the agreement as a whole or whether they render the entire agreement unenforceable.").

### D. Severability of an Unenforceable Contract Provision

The question of whether a provision is severable is resolved under state law. Any doubts as to arbitrability are to be resolved "in favor of arbitration." *Moses H. Cone Memorial Hosp.*, 460 U.S. at 24–25. And, when a particular arbitration agreement includes a severability provision,

"courts should not lightly conclude that a particular provision of an arbitration agreement taints the entire agreement." *Morrison*, 317 F.3d at 675 (citing *Great Earth Cos. v. Simons*, 288 F.3d 878, 890–91 (6th Cir. 2002)).

In this case, as the plaintiffs acknowledge, the ICAs contain a severability clause that states: "If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way." (ICA ¶ 10.) The plaintiffs argue that this clause does not authorize the excision of a "sentence, clause or word" or contain language "permitting a court . . . to perform laparoscopic editing of provisions in the ICA, much less the Commercial rules it references." (Doc. No. 18, at 19.) The severability clause also refers to the removal of a "provision of this agreement" and not to editing the AAA Commercial Rules. (*Id.*) In their Reply, the defendants argue both that it is not possible to "sever a fee-splitting provision which does not exist"[5] and that it is possible to sever the fee-splitting provision in this case if it is deemed to be unenforceable. Neither party references Tennessee's (or Michigan's, for that matter) standards governing the severability of an unenforceable contract clause.

Tennessee courts have held that, when a provision of a contract is void as against public policy, that provision is severable if it is "not a part of the substance of the general contract . . . and is collateral to the contractual matters." *Taylor v. Butler*, 142 S.W.3d 277, 287 (Tenn. 2004); *see also Baugh v. Novak*, 340 S.W.3d 372, 384 (Tenn. 2011) ("[W]hen the provisions of a contract are legally severable, we must give effect to portions of the contract that may be enforced and invalidate only those portions of the contract that are unenforceable." (citing *Biggs v. Reliance Life*

---

[5] The defendants' assertion that the ICA does not incorporate a cost-splitting provision appears disingenuous at best.

*Ins. Co.*, 195 S.W. 174, 176–77 (Tenn. 1917); 5 Williston on Contracts § 12:3)); *see also* Restatement (Second) of Contracts § 184(1) (1981) ("If less than all of an agreement is unenforceable under [public policy, as stated in] § 178, a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange.").

In this particular case, no complex "laparoscopic editing" is required. The ICA, as noted, contains a severability clause that states in full: "If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions shall nevertheless continue in full force without being impaired or invalidated in any way." (ICA ¶ 9.) Although the ICA does not define the term "provision," the court finds that it must be broadly construed to permit the excision of any unenforceable contract provision, if possible.

The provision in the arbitration agreement that implicates the payment of fees and costs is the sentence stating that any arbitration "shall be administered by the American Arbitration Association *under its Commercial Arbitration Rules*." (*Id.* ¶ 11 (emphasis added).) As set forth above, the AAA Commercial Rules incorporate the unenforceable cost-splitting provision(s). Neat severance of the phrase "under its Commercial Arbitration Rules," however, entirely cures the cost-splitting problem.

That is because this dispute, which raises claims under the FLSA, is clearly an employment-related dispute. Upon removal of the reference to the AAA Commercial Rules, the default AAA rules that would apply to this dispute would be the AAA Employment Arbitration Rules and Mediation Procedures ("AAA Employment Rules"), Rule 1 of which states that the AAA Employment Rules "shall be deemed to have [been] made . . . a part of [the parties'] arbitration agreement" whenever that agreement provides for arbitration by the AAA "of an

employment dispute without specifying particular rules." AAA Employment Rule 1. *See* https://adr.org/sites/default/files/EmploymentRules_Web_2.pdf (accessed Mar. 7, 2023).

Under the fee schedule for employment disputes, an employee's filing fee is capped at $350. *See* AAA Employment/Workplace Fee Schedule (Am. Jan. 1, 2023), https://www.adr.org/sites/default/files/Employment_Group_Filing_FeeSchedule.pdf. That sum is less than the $400 filing fee for initiating a lawsuit in federal court (although more than a $400 fee shared by three people), but an individual also still has the ability, as discussed above, to request a waiver of the fee. *See* AAA Employment Rule 43. In addition, when an arbitration proceeds under the AAA Employment Rules, the employer/company bears the obligation to pay all of the arbitrator's expenses and compensation, "unless otherwise agreed by the parties post-dispute." *Id.* This provision obviates the plaintiffs'—and any similarly situated potential claimants'—concerns about shouldering part of the costs of arbitration.

In sum, the court finds that the phrase "under its Commercial Arbitration Rules" is legally severable from the Arbitration clause of the ICA, as this provision is "not interwoven with the rest of the agreement and may be deleted without affecting the rest of the agreement's provisions regarding arbitration." *Morrison*, 317 F3d at 677. That phrase will be severed from the arbitration agreement.

### E. Enforceability of the Arbitration Agreement Generally

Setting aside their challenge to the cost-splitting provision imposed by the reference to the AAA Commercial Rules, which will be severed, the plaintiffs argue that the arbitration agreement more generally is invalid because it lacks consideration, lacks mutual assent, is a contract of adhesion, and is unconscionable. None of these arguments is persuasive.

Under Tennessee law, a contract "must result from a meeting of the minds of the parties in mutual assent to the terms, must be based upon a sufficient consideration, free from fraud or undue

influence, not against public policy and sufficiently definite to be enforced." *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). A Tennessee statute creates "a rebuttable presumption that '[a]ll contracts in writing signed by the party to be bound . . . are *prima facie* evidence of a consideration.'" *Brubaker v. Barrett*, 801 F. Supp. 2d 743, 751 (E.D. Tenn. 2011) (quoting Tenn. Code Ann. § 47-50-103). Thus, "in the absence of fraud[,] [a]n individual who signs a contract is presumed to have read the contract and is bound by its contents." *Wofford v. M.J. Edwards & Sons Funeral Home Inc.*, 490 S.W.3d 800, 810 (Tenn. Ct. App. 2015) (quoting *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011)).

Although the plaintiffs claim that they are not highly educated, had no real bargaining power, were presented with the ICAs on a "take it or leave it" basis as a condition of their employment, and were not offered the opportunity to consult with an attorney before signing (Doc. No. 18, at 14), those factors alone will not permit them to avoid a contract. The plaintiffs do not contend that they requested additional time to review the ICA or to consult with an attorney or that, as a result of their intellect or education, they were incapable of understanding the agreement. Moreover, the ICA itself is just over two pages long, and the arbitration provision consists of three paragraphs. The jury trial waiver is in bold print. (ICA ¶ 11.) The agreement is not invalid as a result of a lack of mutual assent.

As for consideration, "[m]utuality of promises is 'ample' consideration for a contract" under Tennessee law. *Sevier Cty. Sch. Fed. Credit Union v. Branch Banking & Tr. Co.*, 990 F.3d 470, 476 (6th Cir. 2021) (quoting *Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 358 (Tenn. Ct. App. 2001)), *cert. denied*, 142 S. Ct. 2770 (May 31, 2022). Both state and federal courts have consistently found that consideration exists so long as the arbitration agreement binds both parties. *Id.* (citing *Pyburn*, 63 S.W.3d at 358). The arbitration agreement here binds both parties: "LJ and

CONTRACTOR agree to use binding arbitration, instead of going to court, for any 'Covered Claims' that arise or have arisen between CONTRACTOR and LJ . . . . **The parties understand and agree that . . . both parties are waiving the right to a jury trial . . . in favor of arbitration for Covered Claims.**" (*Id.*) Because the arbitration agreements bind both the plaintiffs and the defendants, there is adequate consideration.

The plaintiffs assert that the arbitration agreement was an adhesion contract—a standardized form contract. Although they do not connect the dots, they appear to be arguing that, as an adhesion contract, the arbitration agreement is fundamentally unfair. However, adhesion contracts are only unenforceable in Tennessee when the terms are beyond the reasonable expectations of an ordinary person, oppressive, or unconscionable. *Buraczynski v. Eyring*, 919 S.W.2d 314, 320 Tenn. 1996) (enforcing an arbitration agreement that was a contract of adhesion); *see also Pyburn v. Bill Heard Chevrolet*, 63 S.W.3d 351, 359 (Tenn. Ct. App. 2001) (enforcing an arbitration agreement that was a contract of adhesion where there was "no evidence that Plaintiff questioned Defendant about the contents of the Agreement or did not understand what it meant"). Again, aside from attacking the cost-splitting requirement, the plaintiffs do not argue that any other specific provision of the arbitration agreement is oppressive or unconscionable—that is, that "the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and . . . the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other." *Haun v. King*, 690 S.W.2d 869, 872 (Tenn. Ct. App. 1984). Nor do they point to any terms of the arbitration agreement that are outside the reasonable expectations of an ordinary person.

The court finds, in sum, that the remainder of the arbitration agreement—aside from the provision incorporating the AAA Commercial Rules, which will be severed—is binding and enforceable.

### F. Enforceability of the ICA As a Whole

The plaintiffs also attack the enforceability of the ICA as a whole on the basis that it is a contract of adhesion containing unreasonably harsh terms. The arbitration clause in the ICA reserves for the arbitrator "any and all disputes concerning the arbitrability of any claim." (ICA ¶ 11.) The law is clear that, when a dispute is subject to arbitration, challenges to the enforceability of the contract as a whole (as distinct from challenges to the arbitration agreement itself) are reserved for the arbitrator. *See, e.g.*, *Prima Paint Corp. v. Flood & Conklin Mfg.*, 388 U.S. 395, 403–04, 406 (1967) (holding that a claim of fraud in the inducement of the contract as a whole was for the arbitrator, where the arbitration agreement provided for the arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof"); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443. 446–47 (2006) (holding that the question of whether a "usurious interest" rate provision in a loan agreement rendered the entire contract "illegal and void *ab initio*" was for the arbitrator to decide, because the arbitration provisions were "enforceable apart from the remainder of the contract" under the severability principle); *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 883 (6th Cir. 2021) (holding that a minor's defense of infancy to the validity of the contract as a whole was a "matter of enforceability" delegated to the arbitrator by the arbitration agreement).

The court, therefore, declines to consider the plaintiffs' arguments addressed to the enforceability of the ICAs as a whole, which must be directed to the arbitrator.

### G.      Whether to Dismiss or Stay

The FAA instructs that, "upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration," the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3. The plaintiffs have expressly requested that the court stay this case, rather than dismiss, if it finds that the matter is referable to arbitration. (Doc. No. 18, at 20.)

Without actually adopting an "absolute rule," the Sixth Circuit has recently construed § 3 as a mandatory "command":

> The Act's command that a district court "shall on application of one of the parties stay the trial of the action" conveys a mandatory obligation. The common meaning of "shall" when used in concert with another verb is "[a]m (is, are, etc.) obliged; must." *Shall*, Webster's Int'l Dictionary 2300 (2d ed. 1942). Consistent with this understanding, case law indicates that "[t]he word shall is ordinarily [t]he language of command." *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947)

*Arabian Motors Grp. W.L.L. v. Ford Motor Co.*, 19 F.4th 938, 941 (6th Cir. 2021). The court also observed that other provisions of the FAA reinforced the general preference for a stay, including § 5, which allows parties to ask the court to appoint the arbitrator under some circumstances, and § 7, which allows the court to compel the attendance of witnesses at an arbitration and to hold them in contempt for failure to appear. Based on all of these considerations and the command embodied in § 3, the court held that the district court had erred in denying the defendant's request for a stay instead of dismissal. *Arabian Motors Grp.*, 19 F.4th at 942–43.

Because the plaintiffs here have requested a stay pending arbitration, and there has been no showing that the plaintiffs are "in default in proceeding with such arbitration," 9 U.S.C. § 3, the court will stay this case pending resolution of the separate arbitration proceedings.

## IV.  CONCLUSION

For the reasons set forth herein, the defendant's Motion to Dismiss will be denied, but the Alternative Motion to Stay and Compel Arbitration will be granted. An appropriate Order is filed herewith.

_____

ALETA A. TRAUGER
United States District Judge